IN RE: PALM AVENUE PARTNERS, LLC, Debtor.

Mark Cramer; James M. Grant; William Tompkins; Janet K. O'Neill; Central Property Development, Inc.; The Southby Partnership, Ltd.; Michael Mahoney; D.J. Mahoney Co.; and Palm Avenue Partners, LLC, Plaintiffs,

v.

Palm Avenue Partners, LLC; Thomas E. Leiter; Matthew T. Leiter; The Leiter Group, LLC; Beacon Homes of Florida, LLC; and The Leiter Group, Attorneys and Counselors, P.C., Defendants.

Case No. 8:12–bk–09808–MGW
Adv. No. 8:12–ap–00999–MGW

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Signed August 15, 2017

David S. Maglich, Brendan A. McQuaid, Fergeson, Skipper, Shaw, Keyser, et al., Sarasota, FL, for Plaintiffs.

Edmund S. Whitson, III, Burr & Forman, LLP, Anne C. Leonard, Stephanie C. Lieb, Brigid A. Merenda, Trenam Kemker, Tampa, FL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Michael G. Williamson, Chief United States Bankruptcy Judge

Tom Leiter induced the Plaintiffs—friends and others familiar with his development experience—to invest $1.1 million in Palm Avenue Partners to develop a high-rise condominium project. But the evidence at trial showed that Leiter failed to disclose to the Plaintiffs that he was using the $1.1 million he raised from them (and another $1.4 million he raised from others) to pay $1 million to a company he owned to serve as a "strawman" in the transaction to acquire the land for the condominium project. He also failed to disclose that he was using the Plaintiffs' investment to pay $220,000 to his development company and $160,000 to his law firm for work they supposedly did on the project. In all, Leiter paid himself nearly $1.4 million—more than half—of the $2.5 million he raised for the condominium project, which ultimately failed.

After hearing four days of testimony in this proceeding, the Court must now decide whether Leiter's failure to disclose that he would be paying himself nearly $1.4 million from the investments he solicited gives rise to liability for breach of fiduciary duty and fraudulent concealment. The fact that Leiter was secretly paying himself nearly $1.4 million was plainly material to the Plaintiffs' decision to invest in Palm Avenue Partners. They would not have invested in the project had they known about the payments. And given his

prior personal relationships with most of the Plaintiffs, as well as his partial disclosure of material facts and superior knowledge regarding the transactions at issue, Leiter had a duty to disclose the $1.4 million in payments. Because the evidence at trial showed Leiter failed to disclose material facts when he had a duty to do so, the Court concludes the Plaintiffs met their burden of proof on their fraudulent concealment claim.

## FINDINGS OF FACT

Sometime in 2005, Tom Leiter, an Illinois attorney, decided to develop a condominium project in Sarasota known as The DeMarcay on Palm, which was located at 33 Palm Avenue, Sarasota, Florida. At the time, the property, which consisted of two parcels originally owned by the Floyd C. Johnson Trust and the Floyd C. Johnson and Flo Singer Johnson Foundation, housed the historic DeMarcay Hotel and an old cigar factory.[1] Although the property was zoned Downtown Bayfront, it was part of the Downtown Residential Overlay District,[2] which meant it could be redeveloped into an 18–story high-rise condominium comprising 39 units.

In April 2005, Howard Rooks contracted to buy the DeMarcay property from the Johnson Trust and Johnson Foundation for $2.2 million.[3] Although the property had not been listed, the purchase price was based on a market analysis done by the realtor for the Johnson Trust and Johnson Foundation.[4] Before he could close on the sale of the property, however, Rooks was approached by a number of investors interested in buying the DeMarcay property, including Leiter.[5] One potential investor had offered Rooks $300,000 for the right to buy the DeMarcay property.[6] Because Leiter was an attorney and a "sharp guy" interested in other development projects in Sarasota, Rooks offered to assign the $2.2 million contract to him for $300,000.[7]

Leiter saw this as an opportunity to ensure that he walked away with some money from the project, even if it failed. Rather than assign the $2.2 million contract to Palm Avenue Partners, LLC, the entity he formed to acquire and develop the DeMarcay on Palm condominium project,[8] Leiter instead first assigned the contract to another recently formed entity that he owned, Beacon Homes of Florida, LLC, on June 15, 2005.[9] A week later, Leiter, as Palm Avenue Partners' managing member, then agreed to buy the contract rights from Beacon Homes for $1 million.[10] By first assigning the contract to a straw buyer that he owned (Beacon Homes), Leiter ensured he would able to skim $1 million of the top of the project. But to do so, Leiter had to raise enough money to pay the $2.2 million purchase price and the $300,000 assignment fee, as

1. 12/12/16 Trial Tr. at p. 83, ll. 12–22; p. 84, ll. 7–14; p. 77, ll. 18–23.

2. 12/12/16 Trial Tr. at p. 93, ll. 15–23.

3. Pl.'s Ex. 1; 12/12/16 Trial Tr. at p. 48, ll. 2–20.

4. 12/12/16 Trial Tr. at p. 83, ll. 3–22; p. 84, l. 24–p. 85, l. 16.

5. 12/12/16 Trial Tr. at p. 51, l. 1–13; 12/13/16 at p. 69, ll. 9–16; 12/14/16 Trial Tr. at p. 163, ll. 6–14.

6. 12/12/16 Trial Tr. at p. 51, l. 1–13; 12/14/16 Trial Tr. at p. 172, ll. 2–11.

7. 12/12/16 Trial Tr. at p. 51, l. 1–13; 12/13/16 Trial Tr. at p. 72, ll. 21–25.

8. Pl.'s Ex. 10.

9. Pl.'s Ex. 3, 5; 12/14/16 Trial Tr. at p. 162, l. 23–p. 163, l. 1; p. 191, ll. 21–25.

10. Pl.'s Ex. 6; 12/14/16 Trial Tr. at p. 173, l. 16–p. 175, l. 4.

well as the $1 million fee to Beacon Homes.

So Leiter decided to raise $4 million through a private placement memorandum, which sought to sell 40 preferred equity units in Palm Avenue Partners for $100,000 per unit.[11] Under the private placement memorandum, which is dated July 1, 2005, investors were offered one percent of the net profits from the condominium project as a return on each preferred equity unit.[12] According to the private placement memorandum, the project was expected to generate $7,422,500 in net profits, which meant an investor who bought one investment unit for $100,000 would receive $174,225 in return.[13]

The private placement memorandum represented that the $4 million in capital would be used for "land acquisition, engineering, marketing and related expenses."[14] The private placement memorandum's financial pro forma for the project listed the "Land Acquisition and Related Costs" at $3,725,000.[15] But the $1 million payment to Beacon Homes was not disclosed as part of the "Land Acquisition and Related Costs,"[16] or anywhere else in the private placement memorandum.

After preparing the private placement memorandum, Leiter then set out to raise the $4 million, mostly from friends, as well as investors who had invested in or were familiar with his work on another development project known as Hacienda del Mar.[17] Four of Leiter's friends—James Grant; Joe and Janet O'Neill; and Doug Olson—invested a total of $600,000. One of Leiter's friends (Joe O'Neill) convinced another friend (Michael Mahoney) to invest another $200,000. And two people—Mark Cramer and William Tompkins—invested a total of $300,000 based on Leiter's work on the Hacienda del Mar project. In all, Leiter raised $1.1 million from the Plaintiffs (and another $1.4 million from others).[18] But Leiter never disclosed to any of the Plaintiffs that he had arranged for Beacon Homes to receive $1 million from the $2.5 million he had raised.

By the end of July 2005, Leiter had not raised enough capital to close on the DeMarcay property. Leiter had only raised $400,000, almost $300,000 short of the $671,000 in cash needed at closing.[19] But Leiter anticipated receiving another $400,000 in investments shortly.[20] So Leiter loaned Palm Avenue Partners $300,000,[21] which he immediately repaid to himself when he received additional investments from the Plaintiffs.[22] On July 27, 2005, Palm Avenue Partners was able to close on the sale of the DeMarcay property, paying $671,000 down and taking out

11. 12/14/16 Trial Tr. at p. 175, ll. 16–22; p. 180, ll. 16–20; Pl.'s Ex. 7 at 4.

12. Pl.'s Ex. 7 at 4; 12/14/16 Trial Tr. at p. 178, ll. 11–13; p. 192, ll. 16–18.

13. Pl.'s Ex. 7 at 7.

14. Pl.'s Ex. 7 at 7.

15. Pl.'s Ex. 7 at 6.

16. Pl.'s Ex. 7 at 6; 12/14/16 Trial Tr. at p. 190, ll. 4–20.

17. 12/14/16 Trial Tr. at p. 206, ll. 2–22.

18. Pl.'s Ex. 62; 12/15/16 Trial Tr. at p. 8, l. 13–p. 9, l. 11.

19. 12/14/16 Trial Tr. at p. 184, ll. 9–14; 12/15/16 Trial Tr. at p. 19, ll. 7–18; p 24, ll. 4–12.

20. 12/15/16 Trial Tr. at p. 19, ll. 7–15.

21. Pl.'s Ex. 49; 12/15/16 Trial Tr. at p. 16, l. 8–p. 19, l. 6; p. 26, ll. 5–7.

22. 12/15/16 Trial Tr. at p. 25, l. 3–p. 26, l. 4.

$1.54 million in seller financing.[23]

According to the private placement memorandum, construction was set to begin on June 1, 2006 and be completed by February 1, 2008. Because of delays in the site plan approval process, however, construction was not able to begin in June 2006.[24] According to Leiter, Palm Avenue Partners' proposed site plan faced significant, unexpected opposition from a neighboring developer and local merchants association, which delayed site plan approval.[25] The site plan was finally approved in late 2006, although it was conditioned on construction not beginning until April 2008.[26]

But the project was basically out of money by that point. Of the $2.5 million he raised, Leiter used $671,000 for the down payment for the DeMarcay property, leaving about $1.8 million for other project expenses. By March 2006, just eight months after closing, Leiter had paid Beacon Homes the $1 million assignment fee for serving as a straw buyer.[27] By August 2006, Leiter had paid his development company $220,000 for work it supposedly did on the project.[28] By October 2006, Leiter had paid his law firm more than $160,000 for legal work it supposedly did on the project.[29] In all, Leiter paid himself $1,380,000—nearly 76% of the $1.8 million

available for project expenses (and more than 55% of the total $2.5 million Leiter raised for the project)—by the time the site plan was approved in late 2006.[30]

Ultimately, construction on the project never began. Because of the collapse of the real estate market in 2008, Leiter says there was no financing available to start construction. And with Leiter paying himself nearly $1.4 million, there was basically no cash left to make the mortgage payments on the property. Palm Avenue Partners was in default under its note and mortgage with the Johnson Trust and Johnson Foundation by the end of 2008,[31] not to mention it had failed to pay Howard Rooks on his $300,000 note.[32]

Between late 2006 and the end of 2008, the Plaintiffs were not receiving any financial information on the project.[33] Some Plaintiffs asked for financial information during that time period but never received it. For example, Janet O'Neill requested financial information from Leiter's wife, Barb, since Barb helped solicit investments from her.[34] Barb told Janet that Matt Leiter would be providing the information. Matt, however, never did so. Doug Olson testified he called Tom Leiter every February and March for K–1s and other financial information.[35] Although he re-

23.  12/15/16 Trial Tr. at p. 37, ll. 6–17.

24.  12/15/16 Trial Tr. at p. 105, l. 11–p. 106, l. 13.

25.  12/15/16 Trial Tr. at p. 41, l. 21–p. 42, l. 3; Pl.'s Ex. 63.

26.  Pl.'s Ex. 63; 12/15/16 Trial Tr. at p. 105, ll. 11–13.

27.  Pl.'s Ex. 53 at 1.

28.  Pl.'s Ex. 53 at 8; 12/15/16 Trial Tr. at p. 28, ll. 9–14.

29.  Pl.'s Ex. 53 at 7–8; 12/15/16 Trial Tr. at p. 28, l. 25–p. 29, l. 3.

30.  Pl.'s Ex. 53 at 1, 7, 8; 12/15/16 Trial Tr. at p. 28, l. 9–p. 30, l. 11.

31.  12/12/16 Trial Tr. at p. 89, l. 23–p. 90, l. 7.

32.  12/12/16 Trial Tr. at p. 61, ll. 8–14.

33.  12/13/16 Trial Tr. at p. 88, ll. 2–6.

34.  12/12/16 Trial Tr. at p. 123, ll. 10–25; p. 165, ll. 17–p. 166, l. 1.

35.  12/13/16 Trial Tr. at p. 21, l. 23–p. 22, l. 25.

ceived the K–1s, Olson never received any financial information. On one occasion, Leiter told Olson he could come to Peoria to get access to tax returns and the company checkbook, only to then suggest Olson wait a while because Leiter was remodeling or moving his office.[36] It was not until 2009 that the Plaintiffs started receiving some—albeit minimal—financial information.

In April 2009, Leiter sent the Plaintiffs (and other investors) an update on the project's status, which included a spreadsheet reflecting the sources and uses of funds for the condominium project through the end of 2008.[37] The sources and uses spreadsheet showed that Leiter raised $2.5 million for the project—well short of the $4 million he had hoped to raise. The sources and uses spreadsheet also showed $1,671,975.31 had been used to purchase the DeMarcay property; $402,052.78 had been used for "legal and filing fees"; and $222,491.81 had been used for "management expenses." The sources and uses, however, did not mention Beacon Homes or disclose the $1 million payment to the company.

The only other financial information that was disclosed in 2009 appears to have been the company's tax returns.[38] Michael Mahoney had been requesting tax returns and other information in 2008.[39] He continued those requests through 2009.[40] Mahoney did eventually get the tax returns in May 2009, although the tax returns did not disclose the $1 million payment to Beacon Homes.[41] But despite his repeated requests, Mahoney did not receive any of the rest of the financial information he asked for.[42] Significantly, Leiter never answered Mahoney's simplest question: How much did Palm Avenue Partners pay for the DeMarcay property? [43]

This process repeated itself in 2010 and 2011. Leiter initially provided the Plaintiffs with a sources and uses document for 2008 and 2009.[44] Like the previous sources and uses document for 2008, the updated one showed that Palm Avenue Partners had raised $2.5 million in capital and had spent $1,671,975.31 to purchase the DeMarcay property; $402,052.78 for "legal and filing fees"; and $222,491.81 for "management expenses." [45] This time, William Tompkins took the lead in requesting more information.[46] But Leiter was basically nonresponsive. Eventually, the Plaintiffs sued in state court in October 2011.

The Plaintiffs originally sued Tom Leiter; his son Matt; Tom's development company (The Leiter Group, LLC) and law firm (The Leiter Group, Attorneys and Counselors, PC); and Palm Avenue Partners in state court for damages arising out of the failed condominium project. In their state court complaint, the Plaintiffs asserted claims against the Leiters for breach of fiduciary duty. The Plaintiffs also asserted claims against the Leiters (and some or all

---

**36.** 12/13/16 Trial Tr. at p. 21, l. 23–p. 22, l. 12.

**37.** Pl.'s Ex. 73.

**38.** Def.'s Ex. 221.

**39.** 12/12/16 Trial Tr. at p. 192, l. 20–p. 193, l. 8; Pl.'s Ex. 95.

**40.** 12/12/16 Trial Tr. at p. 200, l. 1–p. 201, l. 7; Pl.'s Ex. 77.

**41.** Def.'s Ex. 221.

**42.** Pl.'s Exs. 99–102.

**43.** Pl.'s Ex. 99; 12/12/16 Trial Tr. at p. 209, l. 25–p. 210, l. 22.

**44.** Pl.'s Ex. 81.

**45.** *Id.*

**46.** Pl.'s Exs. 82, 83, 85, 87, 91 & 93.

the remaining Defendants) for fraudulent and negligent misrepresentation, accounting, and civil conspiracy. After it filed for bankruptcy, Palm Avenue Partners removed the Plaintiffs' state court case to this Court.

While this bankruptcy case was pending, the Plaintiffs obtained leave to add breach of fiduciary duty and misrepresentation claims (plus two contract claims) against the Leiters, as well as Tom Leiter's development company and law firm, as shareholder derivative claims on Palm Avenue Partner's behalf. The Court tried the Plaintiffs' direct and derivative claims over four days.

At trial, it appears the Plaintiffs abandoned all but their direct and derivative breach of fiduciary duty and misrepresentations claims. In their written closing statement, the Plaintiffs only argued that they are entitled to final judgment in their favor on their breach of fiduciary duty and misrepresentation claims. The Court must now decide whether the Plaintiffs met their burden of proof on their misrepresentation and breach of fiduciary duty claims.

## CONCLUSIONS OF LAW [47]

For the reasons discussed below, the Court concludes the Plaintiffs met their burden of proof on what is a fairly straightforward fraudulent misrepresentation claim. The Plaintiffs actually asserted two types of misrepresentation claims. First, the Plaintiffs contend that Leiter failed to disclose (or that he concealed) the $1 million Beacon Homes payment and the nearly $400,000 he paid his management company and law firm for services they

supposedly provided. Second, the Plaintiffs contend that Leiter affirmatively misrepresented the "land acquisition costs" for the condominium project when soliciting investments from the Plaintiffs. At trial, the Plaintiffs proved that the $1 million Beacon Homes payment was material; Leiter had a duty to disclose the payment; Leiter concealed the payment to induce the Plaintiffs to invest in Palm Avenue Partners; and the Plaintiffs relied on his nondisclosure to their detriment. So the Plaintiffs are entitled to final judgment against Leiter on their fraudulent concealment claim.

Because the Plaintiffs are entitled to judgment on their direct claim for fraudulent concealment, the Court declines to address the Plaintiffs' derivative fraud claims or their direct or derivative breach of fiduciary duty claims. Unlike their fraud claims, the Plaintiffs' other claims involve more complicated and novel legal issues. The Court declines to write on those more complicated or novel issues where a final judgment in the Plaintiffs' favor on their fraud claims affords them complete relief.

### The Plaintiffs met their burden of proof on their fraudulent misrepresentation claim as to Tom Leiter.

To prevail on their fraudulent omission or concealment claim, the Plaintiffs must prove that (1) Leiter concealed or failed to disclose a material fact; (2) Leiter knew or should have known that the material fact should be disclosed; (3) Leiter knew or should have known that the concealment or failure to disclose the material fact would induce the Plaintiffs to invest in Palm Avenue Partners; (4) Leiter had a duty to disclose the material fact; and (5)

---

47. The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334. Despite actively participating in these proceedings up through trial, neither party has objected to this Court entering a final judgment. So all parties are deemed to have consented to this Court's authority to enter a final judgment under 28 U.S.C. § 157(c)(2). *Wellness Int'l Network, Ltd. v. Sharif*, — U.S. —, 135 S.Ct. 1932, 1947–48, 191 L.Ed.2d 911 (2015).

the Plaintiffs detrimentally relied on Leiter's failure to disclose or concealment of the material fact.[48]

While Leiter denies that he affirmatively misrepresented the sales price for the DeMarcay property, it was undisputed at trial that he never disclosed the $1 million Beacon Homes payment. Leiter only challenges whether (1) the $1 million payment to Beacon Homes was material; (2) Leiter had a duty to disclose the $1 million payment; and (3) whether Leiter's failure to disclose the $1 million Beacon Homes payment caused the Plaintiffs' loss. The Court concludes, after considering all the evidence at trial, that the Plaintiffs have met the burden of proof as to each of those elements.

### The $1 million payment to Beacon Homes was material

■ Under Florida law, the proposed payments to Beacon Homes and Leiter's development company and law firm are material if the Plaintiffs would not have invested in Palm Avenue Partners had Leiter disclosed the Beacon Homes payment.[49] Leiter concedes that each of the Plaintiffs testified that, in fact, they would not have invested in Palm Avenue Partners had they known about the proposed payments to Beacon Homes and Leiter's development company and law firm—the very definition of material.[50]

But Leiter asks the Court to reject the Plaintiffs' testimony that the payments were material for four reasons. First, Leiter's expert, James Kopecky, testified at trial that because the private placement memorandum stated (accurately in his view) that the actual cost of acquiring the land was $3,750,000, it would not be material to the Plaintiffs where the money went.[51] Second, Leiter says that had the proposed payment to Beacon Homes been important, the Plaintiffs would have asked Leiter about it ahead of time.[52] Third, Leiter says the Plaintiffs waived their right to any additional information based on a provision in the Subscription Agreement that stated that each of the Plaintiffs obtained sufficient information to evaluate the risks of their investment:

> The Investor has obtained in his judgment sufficient information to evaluate the merits and risks of an investment in the Company, understands the business in which the Company is engaged and is able to evaluate the merits and risks.[53]

Fourth, Leiter says his failure to disclose the $1 million payment Beacon Homes did not affect the value of the Plaintiffs' investment.[54] None of Leiter's arguments have any merit.

To begin with, the Court is not persuaded by Kopecky's testimony. Kopecky's testimony is premised on the erroneous assumption that the private placement memorandum accurately stated that the land acquisition cost was $3,725,000. In actuality, the land acquisition cost was $2.5 million (the $2.2 million sales price plus the $300,000 assignment fee to acquire the contract from Howard Rooks). The remaining $1 million was simply a payment to a strawman to allow Leiter to skim $1 million off the top of the project. Putting aside the fact that

48. *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

49. *Atl. Nat'l Bank of Fla. v. Vest*, 480 So.2d 1328, 1332 (Fla. 2d DCA 1985).

50. Def.'s Written Closing Statement at 66.

51. *Id.*

52. *Id.*

53. *Id.* at 66–67 (quoting Pl.'s Ex. 8, ¶ 4.1).

54. *Id.* at 67.

Kopecky's testimony is based on a false assumption, it simply defies common sense that the Plaintiffs would not have cared that Leiter was planning on skimming $1 million off the top of the $2.5 million he raised for the project, particularly where the $2.5 million was well short of the $4 million Leiter hoped to raise.

Moreover, Leiter's argument that the Plaintiffs could (or would) have asked about the $1 million Beacon Homes payment had it been important to them misses the point. How can they ask about a fee they don't know about? In reality, this argument cuts against Leiter. If Leiter truly believed the $1 million Beacon Homes payment would not have discouraged the Plaintiffs' from investing, why didn't he disclose it? In fact, it is obvious from the evidence at trial that Leiter went to great lengths to conceal the payment, belying any contention that the existence of the payment was somehow not material.

And the Court rejects the contention that the Plaintiffs waived their right to claim that information was material. While the Subscription Agreement the Plaintiffs signed does contain language stating the Plaintiffs had information sufficient to evaluate the risks of the investment, that language surely does not immunize Leiter from any fraudulent concealment claims. The case Leiter relies on for his waiver argument, *Billington v. Ginn–La Pine Island, Ltd.*,[55] is easily distinguishable. The disclaimer agreement in *Billington* expressly disclaimed the plaintiff's right to rely on any statements, promises, or representations by a salesperson. This case, of course, involves the nondisclosure or concealment of material facts. More important, unlike in *Billington*, the agreement at issue here does not contain any disclaimer language at all.

Finally, while Leiter's argument that the $1 million Beacon Homes payment did not affect the value of the Plaintiffs' investment has some superficial appeal, it cannot withstand serious scrutiny. Leiter's argument basically boils down to this: "Even if I failed to tell you that $1 million of the land acquisition was a fee I was paying to myself, the land was still worth $3.7 million." It's sort of a "no harm, no foul" argument. In support of that argument, Leiter offered the expert testimony of Haynes Hendry, who testified at trial that the DeMarcay property was conservatively worth $3.7 million as of July 27, 2005.

To some extent, Leiter's argument involves a little sleight of hand. Leiter principally relies on the Florida Supreme Court's 1928 decision in *Pryor v. Oak Ridge Development Corp.*[56] for the proposition that a plaintiff cannot prevail on a fraudulent omission claim unless the fact that was omitted or concealed affected the value of the land. But *Pryor*, which admittedly involved similar facts, was an action to rescind the sale of land. The Florida Supreme Court held that the Court could not rescind the sale based on fraud unless there was a misrepresentation regarding a fact that affected the value of the land.

Unlike the plaintiffs in *Pryor*, the Plaintiffs here are not seeking to rescind the sale. Here, the Plaintiffs are seeking damages from Leiter resulting from his failure to disclose that he intended on paying himself nearly $1.4 million from the investments he was soliciting from them and others. So *Pryor* is distinguishable.

In any event, the Court is not persuaded by Hendry's testimony that the DeMarcay property was worth $3.7 million. Hendry arrived at that valuation using the sales

---

**55.** 192 So.3d 77 (Fla. 5th DCA 2016).

**56.** 97 Fla. 1085, 119 So. 326, 327 (1928).

comparison approach.[57] Using the sales comparison approach, Hendry identified four (relatively recent) comparable sales to determine that price per unit for the Palm Avenue Property was $95,000 per unit.[58] Since the DeMarcay property had been approved for 39 units, a $95,000/unit valuation yields an overall valuation of $3.7 million. But the sales comparison approach is only as good as the comparable sales that are used, and in this case, Hendry overlooked the most obvious comparable sale: the sale of the DeMarcay property from the Johnson Trust and Johnson Foundation to Howard Rooks four months before the effective date of Hendry's valuation of the DeMarcay property.

Hendry conceded that the most accurate indicator of value is the actual sale price.[59] Here, the actual sales price for the land, in an arm's-length transaction just four months before Palm Avenue Partners closed on the sale, was $2.2 million.[60] Rooks, who originally contracted with the Johnson Trust and Johnson Foundation, negotiated a $300,000 assignment fee for the rights under the $2.2 million contract one month before Palm Avenue Partners closed on the sale. So the total sales price for the DeMarcay property was $2.5 million, at most.

Despite testifying that the actual sales price is the best indicator of land value, Hendry offered no credible reason for overlooking the actual sales price for the sale of the DeMarcay property. Instead, Hendry used $3.5 million for the DeMarcay property's sales price. That includes the $1 million Beacon Homes payment, which was not the result of an arm's-length transaction. Hendry tried to explain why the $1 million Beacon Homes payment should be included in the sales price by testifying that Leiter increased the value of the property by changing its zoning to be part of the Downtown Residential Overlay District (DROD), which increased the permitted density for the property from 9 units to 39 units.[61] But that contradicted his own testimony that the DROD was already in place at the time of the sale. The fact is that nothing changed with respect to the DROD between the time Rooks contracted with the Johnson Trust and Johnson Foundation to buy the DeMarcay property and the time Palm Avenue Partners closed on the property. There is no question the actual sales price for the DeMarcay property was $2.5 million, and since that is the most accurate indicator of land value, Leiter's failure to disclose the $1 million Beacon Homes payment did affect the value of the Plaintiffs' investment.

Ultimately, the Plaintiffs testified credibly at trial they would not have invested in Palm Avenue Partners had they known about the $1 million Beacon Homes payment. There is no reason—factual or legal—not to credit that testimony. The only remaining question is whether Leiter had a duty to disclose the $1 million Beacon Homes payment.

### Leiter had a duty to disclose the $1 million Beacon Homes payment

■ The intentional omission of a material fact is fraudulent only when there is a duty to disclose.[62] In an arm's-length

---

57. 12/15/16 Trial Tr. at p. 144, ll. 10–12.

58. *Id.* at p. 141, ll. 2–6; 144, ll. 13–17.

59. *Id.* at p. 156, ll. 2–8.

60. Pl.'s Ex. 1.

61. 12/15/16 Trial Tr. at p. 157, ll. 5–11.

62. *Cafaro v. Zois*, 693 Fed.Appx. 810, 816-17 (11th Cir. 2017) (citing *Ward v. Atl. Sec. Bank*, 777 So.2d 1144, 1146 (Fla. 3d DCA 2001)); *Woods v. On Baldwin Pond*, 634 Fed.Appx. 296, 297 (11th Cir. 2015) ("Florida law recog-

transaction, there is generally no duty to act for the benefit of the other party or to disclose facts that the other party could have discovered through its own diligence.[63] So the failure to disclose facts in an arm's-length transaction ordinarily is not actionable.[64]

But there are (at least) three exceptions to that rule: First, if one party in an arm's-length transaction has a fiduciary relationship with the other party, then the fiduciary has a duty to disclose all material facts. Second, where a party in an arm's-length transaction undertakes to disclose some information, all material facts must be disclosed.[65] Third, nondisclosure of a material fact may be actionable where one does not have an equal opportunity to become apprised of the material facts.[66] Taken together, these three exceptions balance two competing policy goals.

On the one hand, Florida courts have historically drawn a line between misfeasance and nonfeasance.[67] Florida courts have been reluctant to impose a duty on one party to a transaction to act for the benefit (or protection) of the other party, particularly where the facts material to the transaction were equally open to both parties and both parties had an equal opportunity to examine them.[68] On the other hand, courts have recognized that in certain circumstances, it would be unfair to impose a duty on a party to discover material facts.[69]

This is one of those cases.

For starters, Tom Leiter had a fiduciary relationship with the Plaintiffs. Numerous courts have discussed the requirements for a fiduciary relationship. Distilled to their essence, those cases stand for the proposition that a fiduciary relationship, at its core, is one based on trust and confidence:

> The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate.[70]

To establish a fiduciary relationship, the Plaintiffs must prove they reposed confidence in Leiter and that Leiter accepted that trust (or that Leiter acquired trust and then abused it).

The Plaintiffs can prove that Leiter's acceptance of the confidence the Plaintiffs reposed in him was either ex-

---

nizes that [i]ntentional misrepresentation can occur by omission.").

**63.** *Scolieri v. John Hancock Life Ins. Co. (USA),* 2017 WL 700215, at *3 (M.D. Fla. Feb. 22, 2017) (citing *Maxwell v. First United Bank,* 782 So.2d 931, 934 (Fla. 4th DCA 2001); *Watkins v. NCNB Nat'l Bank, N.A.,* 622 So.2d 1063, 1065 (Fla. 3d DCA 1993)).

**64.** *Taylor Woodrow Homes Fla., Inc. v. 4/46–A Corp.,* 850 So.2d 536, 541 (Fla. 5th DCA 2003).

**65.** *Cafaro,* 693 Fed.Appx. at 816-17 (citing *Philip Morris USA, Inc. v. Naugle,* 103 So.3d 944, 946 (Fla. 4th DCA 2012)).

**66.** *Telesphere Int'l, Inc. v. Scollin,* 489 So.2d 1152 (Fla. 3d DCA 1986).

**67.** *Johnson v. Davis,* 480 So.2d 625, 628 (Fla. 1985).

**68.** *Id.*

**69.** *Id.* (explaining evolution of treatment of malfeasance and nonfeasance in tort law).

**70.** *Doe v. Evans,* 814 So.2d 370, 373 (Fla. 2002) (quoting *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419, 421 (1927)).

press or implied.[71] An implied fiduciary relationship depends on the specific facts of each case and the transaction at issue.[72] The Court concludes the facts of this case are sufficient to create a fiduciary relationship.

Although arising in the context of a motion to dismiss, *Bhayani v. Treeco, Inc.*[73] is instructive. There, the plaintiffs (Shabir and Ashifa Bhayani) were long-time professional colleagues and friends with one of the defendants (Russell Weintraub), who occasionally discussed with the Bhayanis a palm grove he owned. Over the years, Weintraub kept the Bhayanis informed of his palm grove business. Eventually, Weintraub, who had superior knowledge of the palm grove industry, invited the Bhayanis to invest in a palm field. The Bhayanis decided to invest in Weintraub's palm field based on his representations that he was an expert in operating palm fields for profit.

The court in *Bhayani* ruled that those facts were sufficient to allege a fiduciary relationship. Looking to state law, the *Bhayani* court noted that a "fiduciary relationship may exist wherever one man trusts in and relies upon another."[74] The court concluded that allegations of a personal relationship between the parties, along with Weintraub's experience and expertise in the palm grove business, was sufficient to allege the Bhayanis put their trust in Weintraub:

> Specifically, plaintiffs have alleged that they placed their trust in Weintraub due to his years of friendship as well as his experience in the palm grove business. Further, plaintiffs allege that Weintraub accepted that trust and that he subsequently acted contrary to that trust and that plaintiffs were damaged as a result. Therefore, the Court finds that [the Bhayanis] have alleged fiduciary duties independent of the contractual obligations of the parties . . . .[75]

The Plaintiffs here, like those in *Bhayani*, placed their trust in Leiter based on their years of friendship and his development experience and expertise. For example, James Grant had a close personal relationship with Leiter for more than fifty years.[76] Grant was unequivocal at trial that he trusted Leiter[77] and that he would not have invested $100,000 in Palm Avenue Partners had Leiter not been involved.[78] Joe O'Neill was also a close personal friend of Leiter. And O'Neill's wife, Janet, invested $300,000 in part because she trusted Leiter personally.[79] Another Plaintiff, Doug Olson, decided to invest in Palm Avenue Partners after Leiter brought the investment opportunity up casually as

---

**71.** *Clark v. Ashland, Inc.*, 2017 WL 468213, *14 (M.D. Fla. Feb. 3, 2017) (Steele, J.) (citing *Hogan v. Provident Life & Accident Ins. Co.*, 665 F.Supp.2d 1273, 1287 (M.D. Fla. 2009)).

**72.** *Taylor Woodrow Homes Fla, Inc. v. 4/46-A Corp.*, 850 So.2d 536, 540 (Fla. 5th DCA 2003). An express fiduciary relationship is created either by contract or legal proceedings." *Clark*, 2017 WL 468213, at *14 (citing *Hogan v. Provident Life & Accident Ins. Co.*, 665 F.Supp.2d 1273, 1287 (M.D. Fla. 2009)). The Plaintiffs have not alleged an express fiduciary relationship. Instead, they contend the facts of this case give rise to an implied fiduciary relationship.

**73.** 2011 WL 250434 (M.D. Fla. Jan. 25, 2011) (Steele, J.).

**74.** *Id.* at *5 (citing *Jacobs v. Vaillancourt*, 634 So.2d 667, 670 (Fla. 2d DCA 1994)).

**75.** *Id.* at *6.

**76.** 12/12/16 Trial Tr. at p. 257, ll. 1–12.

**77.** *Id.* at p. 316, ll. 14–25.

**78.** 12/13/16 Trial Tr. at p. 7, l. 6–p. 8, l. 2.

**79.** 12/12/16 Trial Tr. at p. 115, ll. 2–14.

friends.[80] Michael Mahoney, a fourth Plaintiff, invested in the project based on a recommendation by Joe O'Neill, who told Mahoney the investment was a no-brainer based on what he had been told by Leiter.[81] So most of the investments—a total of $800,000—were made based on Leiter's prior personal relationships with three of the Plaintiffs.

The remaining Plaintiffs invested in Palm Avenue Partners because of Leiter's development expertise. Mark Cramer invested in Palm Avenue after checking into Leiter's previous development work at a project known as Hacienda del Mar.[82] Likewise, William Tompkins invested because Leiter's son Matt told him that the Leiters had developed Hacienda del Mar, which Tompkins believed was a quality development.[83] Cramer's and Tompkins' investments totaled another $300,000. Janet O'Neill, who invested because of her personal relationship with Leiter, also believed Leiter was an expert. But regardless of whether the Plaintiffs had a prior personal relationship with Leiter or were relying on his apparent expertise, all (except one) testified they invested in the projected because they trusted Leiter.

Even if the Plaintiffs had not put their trust in Leiter, he still owed them a duty to disclose the $1 million Beacon Homes payment because he undertook to disclose some information about the "cost" of acquiring the DeMarcay property. Specifically, Leiter represented in the private placement memorandum that the cost of acquiring the DeMarcay property—i.e., the "Land Acquisition and Related Costs"—was $3,725,000. Once Leiter disclosed the Land Acquisition and Related Costs, he had a duty to disclose all material facts related to those costs, including that $1 million of the $3,725,000 was essentially a payment to himself.

Leiter suggests that the disclosure of the Land Acquisition and Related Costs in the private placement memorandum did not create a duty to disclose additional information, such as the $1 million Beacon Homes payment, because the investment in Palm Avenue Partners was offered under Regulation D of the U.S. Securities Act of 1933 to people who were accredited investors. The fact that the private placement memorandum was offered under Regulation D does not change the outcome.

It was clear from the testimony of Leiter's own expert that Regulation D functions the same as Florida common law. Just as under Florida law, Leiter had no obligation to disclose material facts as part of a Regulation D offering. But once Leiter disclosed information, it had to be accurate.[84] To be accurate, the private placement memorandum needed to disclose the $1 million fee to Beacon Homes. So whether analyzed under Florida law or Regulation D, once Leiter disclosed that the Land Acquisition and Related Costs were $3,725,000, he was required to disclose that the Land Acquisition and Related Costs included the $1 million fee to an entity he owned.

Finally, Leiter had a duty to disclose the $1 million Beacon Homes payment because he had superior knowledge about the transactions between Howard Rooks, Beacon Homes, and Palm Avenue Partners. The general rule that there is no

---

80. 12/13/16 Trial Tr. at p. 12, l. 5–p. 13, l. 6.

81. 12/12/16 Trial Tr. at p. 239, ll. 8–25.

82. 12/13/16 Trial Tr. at p. 78, l. 12–79, l. 5.

83. 12/14/16 Trial Tr. at p. 41, l. 18–p. 42, l. 18; p. 50, ll. 7–23.

84. *Id.* at p. 222, ll. 13–19.

duty to disclose in an arm's-length transaction is predicated on the assumption that both parties have equal access to information.[85] Here, the Plaintiffs had no ability to discover the $1 million Beacon Homes payments.

The original assignment between Rooks and Leiter assigning the $2.2 million property purchase and sales contract to Beacon Homes, as well as the assignment transferring the rights under the purchase and sale contract from Beacon Homes to Palm Avenue Partners, were private transactions. Neither agreement was recorded in the public record. And the Plaintiffs would have had no reason to know or ask about the assignments.

Leiter, however, contends the Plaintiffs were put on inquiry notice because the $2.2 million sales price was disclosed in the public records. In support of that argument, Leiter points to a Florida Department of Revenue form, which is used for determining the documentary stamp tax. That document, which Leiter testified was a public record, reflects a $2,200,000 purchase price.

Ignoring for a moment that the Department of Revenue form flatly contradicts Leiter's contention that the sales price for the DeMarcay property was $3.5 million, the Court is not persuaded that the form was actually recorded in the public record.[86] Had the form been recorded in the public record, it would bear recording information, such as the O.R. Book and Page Number (or the Document ID Number) and the date it was recorded. The Department of Revenue form contains none of

that.[87] All it contains is a fax stamp. It is unclear whether the Department of Revenue form was ever recorded in the public record, but what is clear is that there is no evidence before the Court that it was.

The presence of any one of the three exceptions to the general "no duty to disclose in an arm's-length transaction" alone would be sufficient to impose a duty on Leiter to disclose the $1 million Beacon Homes payment. The fact that all three exceptions are present makes an even more compelling case that this is one of those circumstances where Florida courts have determined it would be unfair to allow Leiter to conceal the $1 million Beacon Homes payment.

*Leiter's failure to disclose the $1 million Beacon Homes payment caused the Plaintiffs' loss*

██ The Plaintiffs contend that they collectively lost their $1.1 million investment in Palm Avenue Partners because of Leiter's fraudulent concealment. Leiter does not dispute the amount of the Plaintiffs' damages claim, although he does say he should be entitled to a setoff for any distributions the Plaintiffs receive in Palm Avenue Partners' chapter 11 case. Leiter's main argument is one of causation—namely, that the Plaintiffs' loss was really caused by the Great Recession and collapse of the residential real estate market.

The Court need not go into this defense in great detail because it overlooks one critical point: The Plaintiffs never would have invested had Leiter disclosed the $1 million Beacon Homes payment to them. So there wouldn't have been any money to

---

**85.** *Telesphere Int'l, Inc. v. Scollin*, 489 So.2d 1152 (Fla. 3d DCA 1986) (citing 27 Fla. Jur. 2d *Fraud and Deceit* § 38 ("The nondisclosure of a material fact by one party to a transaction may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact.")).

**86.** Pl.'s Ex. 26.

**87.** *Id.*

lose in the Great Recession had Leiter disclosed the $1 million Beacon Homes payment. For that reason, the Court concludes Leiter's failure to disclose the $1 million payment caused the Plaintiffs to lose their investment.

### Only Tom Leiter and Palm Avenue Partners can be liable for the Plaintiffs' loss

██ The Plaintiffs' fraudulent concealment claim as to the $1 million Beacon Homes payment was asserted against Tom Leiter, Matt Leiter, and Palm Avenue Partners. Tom Leiter is liable, of course, because he personally engaged in the tortious conduct at issue—i.e., he concealed or failed to disclose the $1 million Beacon Homes payment.[88] Palm Avenue Partners is liable because Tom Leiter was acting on Palm Avenue Partners' behalf, and a limited liability company is liable for the fraud of its agent committed while in the scope of the agent's employment.[89] But the Plaintiffs have not proven any basis for holding Matt Leiter, Tom Leiter's son, liable for fraudulent concealment.

There was no evidence at trial that Matt Leiter made any affirmative misrepresentations. It is true that, like his father, Matt Leiter did not disclose the $1 million Beacon Homes payment. The Plaintiffs, however, have not proven that Matt Leiter

knew about—much less had a duty to disclose—the $1 million Beacon Homes payment. So only Tom Leiter and Palm Avenue Partners could be liable for fraudulent concealment.

### Leiter's defenses do not preclude entry of final judgment against him.

Tom Leiter basically asserts two affirmative defenses to the Plaintiffs' fraudulent concealment claim. The first defense, which is not technically an affirmative defense since Leiter does not bear the burden of proof,[90] is that the Plaintiffs lack standing to bring their fraudulent concealment claim. The second defense is that the Plaintiffs' fraudulent concealment claim is barred by the statute of limitations. Neither defense precludes entry of judgment in the Plaintiffs' favor.

### The Plaintiffs have standing to bring their fraud claim

██ Leiter has a two-part argument why the Plaintiffs do not have standing to bring their fraudulent concealment claim. According to Leiter, the Plaintiffs' misrepresentation claim is a derivative—not direct—claim. And because the Plaintiffs' claim is derivative in nature, it must fail because the Plaintiffs failed to satisfy conditions precedent to bringing that claim,

---

**88.** *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.,* 125 F.Supp.2d 1093, 1104-05 (S.D. Fla. 2000) ("Florida courts uniformly hold that if an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort.") (citing *First Fin. USA, Inc. v. Steinger,* 760 So.2d 996, 997-98 (Fla. 4th DCA 2000); *Scutieri v. Miller,* 605 So.2d 972, 973 (Fla. 3d DCA 1992)).

**89.** *See Ramel v. Chasebrook Constr. Co.,* 135 So.2d 876, 883 (Fla. 2d DCA 1961) ("It is

generally held that a corporation is vicariously liable for fraud and misrepresentation practiced by its directors or agents within the scope of their employment.")

**90.** *Winchel v. PennyMac Corp.,* 222 So.3d 639, 642-43 (Fla. 2d DCA 2017) (explaining that "[a]s defenses go, standing has become something of a legal oddity" because courts "treat it as an affirmative defense in that the defendant must put it in play by raising it in an appropriate pleading," but "once it is injected into a case by a defendant's pleading, [courts] say it must be proved at trial by the plaintiff").

such as making pre-suit demand on Palm Avenue Partners. Leiter's argument, at least as it relates to the Plaintiffs' fraudulent concealment claim, is based on a misreading of *Strazzulla v. Riverside Banking Co.*[91]

■ *Strazzulla* involved the same issue present here: Do shareholders of a company have standing to bring a direct claim for fraudulent inducement or must that claim be brought as a derivative action? After acknowledging this is a murky issue under Florida law, the *Strazzulla* court explained that the proper test for determining standing was announced in *Dinuro Investments, LLC v. Camacho*,[92] the same test Leiter urges the Court to follow here. Under the two-prong test devised in *Dinuro Investments*, which the *Strazzulla* court adopted, an action may be brought as a direct action only if (1) there is a direct harm to the shareholder; and (2) the shareholder has suffered a special injury distinct from those sustained by other shareholders or members.[93]

In *Strazzulla*, the court held the plaintiffs satisfied the two-prong test for standing. The court concluded the alleged harm from the misrepresentations satisfied the first prong because those harms could not belong to the corporation.[94] And the second prong was satisfied because the court concluded that the injury the shareholders suffered in that case were distinct from the injury suffered by other shareholders who did not receive the same misrepresentations.[95] Leiter, however, argues this case is different from *Strazzulla* because in that case, the second prong was satisfied only because there were other shareholders who did not receive misrepresentations.

The Court does not read *Strazzulla* the same way. The Court reads *Strazzulla* to say that the second prong is satisfied if the injury the Plaintiffs suffered here would be different from one sustained by another member who did not receive the same misrepresentation—not that there must be another actual member who did not receive a misrepresentation. Leiter's reading of *Strazzulla* is not consistent with the general understanding of direct and derivative claims.

Under Leiter's reading, nine members of a limited liability company could bring a direct claim for fraudulent inducement if there is a tenth member who was not fraudulently induced into investing in the limited liability company. But if the tenth member was also fraudulently induced into investing in the limited liability company, somehow those direct claims become converted into a derivative claim held by the corporation as a whole.

A derivative claim is "one in which a stockholder seeks to enforce a corporate right or to prevent or remedy a wrong to the corporation."[96] A claim that a shareholder was fraudulently induced into investing in a corporation doesn't become a claim to enforce a corporate right or to remedy a corporate wrong just because each of the shareholders were fraudulently induced to invest in the company. Just the

---

**91.** 175 So.3d 879 (Fla. 4th DCA 2015).

**92.** *Id.* at 882–83 (citing *Dinuro Inv., LLC v. Camacho*, 141 So.3d 731 (Fla. 3d DCA 2014)).

**93.** *Id.* at 884.

**94.** *Id.* at 885.

**95.** *Id.*

**96.** *Id.* at 882–83 (quoting *Salit v. Ruden, McClosky, Smith, Schuster & Russell*, 742 So.2d 381, 388 (Fla. 4th DCA 1999)).

opposite. The fraudulent inducement claim would not be to remedy a wrong *to* the corporation; it would be to remedy a wrong *by* the corporation.

Perhaps this is best illustrated by comparing the Plaintiffs' fraudulent concealment claim to some of their other claims in this proceeding that are derivative in nature. One of the Plaintiffs' fraud claims is that Leiter committed a fraud by billing for legal services he didn't provide (or by overbilling for those he did). That fraud claim seeks to remedy a wrong to Palm Avenue Partners since the company is the one that paid for services it didn't receive. Assuming Leiter did defraud Palm Avenue Partners, each of its investors would have been harmed. But they would not have suffered a distinct injury. The same is true for the Plaintiffs' breach of fiduciary duty claim to the extent it was based on allegations that Leiter, for instance, exhausted all the capital he raised before beginning construction.

By contrast, the Plaintiffs' fraudulent concealment claim seeks to enforce a right each Plaintiff has. Each Plaintiff separately invested in Palm Avenue Partners; each Plaintiff invested a different, discrete amount; and each Plaintiff was harmed by Leiter's failure to disclose the $1 million Beacon Homes payment because each of the Plaintiffs testified they wouldn't have invested had they known about the payment. Had the $1 million Beacon Homes payment been disclosed to another member, he or she would not have suffered the same injury the Plaintiffs did. In no way can the Plaintiffs' claim be viewed as seek-

ing to remedy a wrong to Palm Avenue Partners. Because Leiter was acting on Palm Avenue Partners' behalf, the Plaintiffs are seeking to remedy a wrong by Palm Avenue Partners. So the Plaintiffs have standing to bring their fraudulent concealment claim as a direct claim.

### The Plaintiffs' fraud claim is not barred by the statute of limitations

▉ The statute of limitations for a fraudulent concealment claim is four years.[97] Ordinarily, the statute of limitations begins to run "when the last element constituting the cause of action occurs."[98] For fraud claims, however, the statute of limitations begins to run when "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."[99] The Plaintiffs filed their claims in state court on October 6, 2011. Because the Plaintiffs filed their lawsuit on October 6, 2011, Leiter must show that the Plaintiffs knew or should have known about the facts giving rise to their fraud claim before October 6, 2007 in order for their claim to be time barred.

But Leiter was unable to make that showing. The sole basis for Leiter's claim that the Plaintiffs should have known of the $1 million Beacon Homes payment by October 2007 is the fact that the Department of Revenue form reflecting the $2.2 million sales price was purportedly in the public record in July 2005[100] and that some of the Plaintiffs testified that they were becoming concerned about a pattern of misinformation as early as 2006.[101] None

---

97. § 95.11(3)(j), Fla. Stat.

98. § 95.031(1), Fla. Stat.

99. § 95.031(2)(a), Fla. Stat.

100. Pl.'s Ex. 26.

101. 12/13/16 Trial Tr. at p. 86, ll. 5–14; p. 90, ll. 13–18; Joe O'Neill Dep. Tr. at p. 53, l. 17–p. 54, l. 23; p. 66, l. 16–p. 69, l. 16.

of that evidence suggests the Plaintiffs should have known of Leiter's fraud.

As the Court has already explained, the record evidence does not support the conclusion that the Department of Revenue form was actually recorded in the public records. Had it been, the form would contain basic recording information. But it does not.[102] And while it is true that Mark Cramer testified that by 2006 and 2007, he "could see a pattern developing of misinformation and misappropriation by the Leiters,"[103] and that Joseph O'Neill testified that he "didn't feel [he] was getting the simple, clear, concise truth" from Leiter,[104] the Court is not convinced they should have known of Leiter's fraud at that point.

At best, that testimony suggests the Plaintiffs had a duty at that point to be begin exercising some due diligence to uncover Leiter's fraud. Had the Plaintiffs done so, Leiter says, they would have discovered the $1 million Beacon Homes payment. Leiter says that the $1 million Beacon Homes payment was disclosed in Palm Avenue Partners' books and records, such as its bank account statements, ledgers, and tax returns, which the Plaintiffs had the right to inspect under the operating agreement.

There is one problem with Leiter's argument. It overlooks the fact that the Plaintiffs did attempt to inspect Palm Avenue Partners' books and records. Leiter argues the Plaintiffs cannot show that they could not access Palm Avenue Partners' tax returns because Leiter turned them over when certain Plaintiffs requested them.

That's not quite right. Leiter did not turn over the tax returns when Doug Olson initially requested them. Instead, Leiter told Olson, who lives in Florida, that he'd have to come to Leiter's office in Peoria, Illinois, to inspect those records but suggested that he wait awhile because Leiter was remodeling his office and that the records were all buried.[105] Leiter's son did e-mail the tax returns to Michael Mahoney in 2009, but only after several requests.[106] The evidence at trial was that from 2006 to 2009, the Plaintiffs were trying to get financial records from Leiter.

It was not until 2009 that Leiter finally started producing documents showing the sources and uses of the $2.5 million that Leiter raised. In April 2009, Leiter provided the Plaintiffs with a document called "Sources and Uses of Funds Thru 12/31/08 (Unadjusted)."[107] That documents shows (for the first time) that Leiter only raised $2.5 million (not the $4 million he said he needed) and used $1,671,975.31 to purchase the DeMarcay property.[108] It's not clear to the Court that the Plaintiffs should have known of the $1 million Beacon Homes payment once they received the April 2009 Sources and Uses.

But the Court is convinced that is the earliest the Plaintiffs could have known of Leiter's fraud. The Court need not go any further than that because this action is not time barred so long as the Plaintiffs did not discover (or should not have discovered) Leiter's fraud before October 2007. Because the Plaintiffs could not have discovered their fraudulent concealment claim

**102.** Pl.'s Ex. 26.

**103.** 12/13/16 Trial Tr. at p. 90, ll. 13–18.

**104.** Joe O'Neill Dep. Tr. at p. 66, l. 16–p. 69, l. 16.

**105.** *Id.* at p. 21, l. 23–p. 22, l. 12.

**106.** Def.'s Ex. 221.

**107.** Pl.'s Exs. 67 & 73.

**108.** Pl.'s Ex. 67.

until April 2009, their fraudulent concealment claim is not time barred.

## CONCLUSION

After hearing four days of testimony, the Court can come to only one conclusion: Leiter fraudulently induced the Plaintiffs into investing in Palm Avenue Partners so that he could skim $1 million from the project. Although the facts of this case are complicated, three key facts are not in dispute:

First, the DeMarcay property was not acquired for $3.725 million. Rather than assign the right to buy the DeMarcay property for $2.2 million to Palm Avenue Partners, Leiter instead assigned it to a company he owned and then, acting on Palm Avenue Partners' behalf, agreed to pay the company he owned a $1 million fee for serving as a straw buyer. In other words, Leiter skimmed $1 million off the top of the $2.5 million in capital contributed to Palm Avenue Partners.

Second, although he did not contribute any capital to the project, Leiter ended up receiving nearly $1.4 million from the $2.5 million in investments. There was the $1 million fee for Leiter's entity (Beacon Homes) serving as a strawman, which was paid in full by March 13, 2006. Leiter also paid his management company $220,000 in "management" fees and his law firm $160,000 in attorney's fees even though he wasn't a licensed attorney in Florida. By the time Leiter paid himself nearly 56% of the $2.5 million in capital that was raised, the project was basically out of money.

Third, everyone else was left holding the bag. Leiter gave Rooks a $300,000 note for assigning his right to buy the DeMarcay property. But Rooks was never paid on the note. The Plaintiffs invested $1.1 million in the project. But they never received their capital contributions back—much less a profit on the project. Other investors invested $1.4 million. But they never got their capital back. The Johnson Trust and the Johnson Foundation did receive some monthly payments, but they were owed more than $1.8 million as of the date of the filing of the Palm Avenue Partners chapter 11 case. Although Leiter points out that he (or entities he owned) loaned Palm Avenue Partners $534,850 to try to preserve the project and that those loans were never repaid, he conveniently omits the fact that he received nearly $1.4 million from the project. So while everyone else was left holding the bag, Leiter walked away with more than $900,000 in his pocket from a failed condominium project that literally never broke ground.

On these facts, the Court concludes Leiter had a duty to disclose the $1 million Beacon Homes payment, that he failed to do so, and that his failure to do so injured the Plaintiffs. Accordingly, the Court will, by separate order, enter final judgment in the Plaintiffs' favor on their fraudulent concealment claim and awarding them the return of their collective $1.1 million investment.

Because each of the Plaintiffs invested different amounts at different times, the Court will need to hold a hearing to determine the amount of prejudgment interest each Plaintiff is entitled to. The Court will schedule that hearing by separate order. In the meantime, these Findings of Fact and Conclusions of Law are a non-final order.